LYNDE SELDEN, CBN 72591
Attorney at Law
544 Silvergate Ave
San Diego, CA 92106
619-871-3928
lyndeselden@cox.net

ATTORNEY FOR PLAINTIFFS

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIANA CECELIA CHAMBERS AND R.A.O-J[1]<br><br>Plaintiff(s),<br><br>vs.<br><br>SAN DIEGO HOUSING COMMISSION, CITY OF SAN DIEGO, AND DOES 1 THROUGH 100,<br><br>Defendant(s). | Case No.: 3:20-cv-00715-W-MDD<br><br>MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS OF CITY OF SAN DIEGO [FRCP 12(b)(6)]<br><br>NO ORAL ARGUMENT PURSUANT TO LOCAL RULE<br><br>Judge: Thomas J. Whelan<br>Court Room: 3C (Edward J. Schwartz)<br>Date: June 1, 2020<br>Trial: Not Yet Set |

---

[1] Initials of minor provided per Fed. R. Civ. P. 5.2.

# I.

# INTRODUCTION

Plaintiffs accuse the City and the city's housing commission of failing to protect their civil rights, as they are bound to do under federal law, 24 CFR 100.7(a)(1)(iii)(2016), in that they permitted a neighboring tenant to racially and disgustingly harass and harangue the plaintiffs, knew it was going on, and did nothing about it for more than 2 years, all while having the right and the ability to evict the neighboring tenant, which eviction in fact was finally court-ordered some 753 days after the Plaintiffs' first complaint.  Doc. 1-3. That the plaintiffs are a 72 year old retired, disabled, U.S. Navy veteran and her 5 year old (at the time the harassment began) great-grandson renders the City's and the housing commission's inaction and apparent indifference to their circumstances all the more egregious. What is at the heart of Plaintiffs' case is the direct liability the landlord has for racial discrimination  and a hostile home environment created by a third party, as prescribed in rules published by the Department of United States Housing and Urban Development ("HUD"), even in the case where the third party tenant was the actual bad behavior perpetrator.  The City, under the same HUD rule, is vicariously liable for the Plaintiffs' injuries.

The City of San Diego seeks dismissal of this action against it on the argument that it and the San Diego Housing Commission (SDHC) are independent and the actions of the SDHC are not attributable to the City. The City seeks to evade its vicarious liability for the misconduct of its agency, SDHC: as noted in 24 CFR 100.7 (b) "A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law."  As argued below, the housing commission's independence is illusory and the Court should require that the City participate as a defendant in this action.  Plaintiffs have stated a plausible legal theory, [*Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)] all quite evident looking at the relationship between the City and the SDHC, and the City's motion to dismiss ought to be denied.

## II.

## ALLEGATIONS OF THE AMENDED COMPLAINT

Ms. Chambers and her now-7 year-old great grandson, live in housing rented to her by the SDHC. Ms. Chambers has been a tenant at 4095 Valeta St. Apartment A San Diego, CA 92110 since 2012, and a tenant of the SDHC since 2004. Both plaintiffs are African-American and Ms. Chambers is 72 years old and a disabled US Navy veteran. Doc. 1-3, page 1 of 21, ¶ 1. The tenancy is described in the Residential Lease attached as Exhibit 1 to the Amended Complaint. Doc.1.3, page 6 of 21 et seq. In the lease, the landlord promises, among other things, to keep the premises in "a decent, safe and sanitary condition…" [Doc 1-3, page 11 of 21, ¶21.a.] and to abide by "applicable housing codes…materially affecting health and safety". Doc 1-3, page 11 of 21, ¶ 21.b.

The Amended Complaint identifies SDHC as the plaintiffs' landlord and alleges that the SDHC is an agency of the City of San Diego and is governed by the Housing Authority of the City of San Diego, and that the nine members of the San Diego City Council are board members of the SDHC. It is alleged "SDHC is empowered to make public housing available to persons with a variety of economic or physical needs." Doc.1-3, page 2 of 21, ¶ 2.

In April, 2017 a new tenant was assigned to the apartment directly over the plaintiffs. From that point on, the peace and quiet enjoyment of the Plaintiffs suffered. The new overhead tenant engaged in loud and unremitting racial harassment and created a hostile and unsafe living environment for the plaintiffs. On a daily basis, the new tenant screamed insults at Plaintiff Chambers while descending the staircase to her apartment, or ascending it, or standing outside plaintiffs' apartment on the sidewalk or close to her front window: "You nigger bitch." , "Come

1  out here you old bitch, I'm gonna fuck you up", "Nigger cunt", "Old cunt", and
2  variations of these insults; these screamed insults were usually loud enough for her
3  great grandson to hear.  In her apartment at all times of the day and night the new
4  tenant stomped on the floor, or threw or dropped heavy objects on the floor, making
5  a loud thumping racket in Plaintiffs' apartment below, dropping, thumping, and
6  stomping heavy enough to rattle ceiling mounted fixtures in Plaintiffs' apartment,
7  creating a disturbance, keeping Plaintiffs awake, and awakening them if they were
8  lucky enough to fall asleep before the stomping began.  The new tenant's behavior
9  was threatening also: for example, walking to and from the laundry room, she could
10 be seen dressed in black wearing a hoodie over her head, mumbling to herself, often
11 loud enough that her curses and threats against people she saw were audible.  Doc.1-
12 3, page 2 of 21, ¶ 3.
13         As alleged, Ms. Chambers began complaining about the new tenant and the
14 harassment in September 2017:  she complained about the new tenant's behavior and
15 the disturbance it created in the apartment complex countless times, and specifically
16 the racial taunts and curses, through emails, telephone calls, and face-to-face
17 meetings with her property managers. By October, 2017, scarcely 6 months after
18 moving in, as part of the harassment, the new tenant had filed with SDHC more than
19 100 false complaints against Chambers.  The new tenant called 911 numerous times,
20 and falsely reported that Chambers was causing a disturbance, creating a chemical
21 smell, arguing loudly in her apartment and disturbing the peace, all investigated by
22 the SDPD, all determined to be unfounded complaints. The new tenant called Child
23 Protective Services numerous times and reported that Chambers abused her great
24 grandson - each false report requiring CPS to investigate and interview Chambers
25 and the boy. All such investigations determined the reports by the new tenant to be
26 unfounded.  Doc.1-3, page 2 of 21, ¶ 4.
27         Plaintiff Chambers did what she could to protect herself and her great
28 grandson: in addition to complaining to SDHC dozens of times, she obtained a civil

restraining order against the new tenant in December, 2018. She kept a log of harassing incidents, overhead noise, and ceiling thumps and sent it to the SDHC periodically to keep it informed. In May, 2019, during one of her neighbor's tirades on the sidewalk in front of Plaintiffs' apartment, Chambers called the SDPD and the new tenant was arrested for violating the restraining order and charges against her were filed. Within 2 weeks after her arrest, the new tenant again reported Chambers to CPS and another investigation was conducted and the complaint determined to be unfounded. Doc.1-3, page 3 of 21, ¶ 5.

All of this racial discrimination and harassment and hostility was reported to SDHS repeatedly and, when Chambers was able to record the noise or the threats or disturbance, she sent recordings to SDHC so it could determine for itself that the noise, the cussing, the threats, and the racial harassment were real, outrageous, and disturbing: Plaintiff Chambers was always advised that SDHC is "working on" a resolution, but nothing changed. Doc.1-3, page 3 of 21, ¶ 6.

Plaintiffs experienced on a day to day basis enduring and extreme emotional distress, in fear of the erratic behavior of their neighbor and her continuous loud thumping upstairs and hollered abrasive, insulting and rude racial curses and threats. Obviously distressing to Chambers and her great grandson, SDHC did nothing to protect them from the harassment and the discrimination until, finally, on August 7, 2019, SDHC commenced an unlawful detainer action against the upstairs neighbor. That action resulted in her eviction and she finally moved out of the apartment above Plaintiffs' in December, 2019, some 2 years and 9 months after moving in. Plaintiffs' perception that their complaints about their upstairs neighbor had been ignored by SDHC for months was corroborated by the unlawful detainer trial court whose Statement of Decision specified, "And even after substantiating Diana Chambers' complaints, [SDHC] took no action against [the neighbor]. ... [SDHC] further took no action after a temporary restraining order was issued against [the neighbor] and

1  even after receiving additional complaints from Diana Chambers after the issuance
2  of the restraining order." Doc. 1-3, page 4 of 21, ¶ 8.
3     Throughout the entire ordeal for the Plaintiffs, SDHC had the means to
4  remove the racist neighbor and thereby to protect Ms. Chambers and her great
5  grandson.  The neighbor's misconduct was a clear violation of her lease agreement
6  which specifies she can be evicted if she creates a threat to the health and safety of
7  other residents, or if she engages in criminal activity, among other things. Despite
8  ample evidence that the overhead neighbor violated these rules, and even after
9  substantiating Plaintiffs' complaints about her, SDHC unreasonably delayed action to
10 remove her.
11    This failure to evict the neighbor violated the Fair Housing Act ("FHA" or
12 "Act"): 42 U.S.C. § 3601 et seq.  Section 3604(b) of the Act makes it unlawful "[t]o
13 discriminate against any person in the terms, conditions, or privileges of sale or
14 rental of a dwelling, or in the provision of services or facilities in connection
15 therewith, because of race, color, religion, sex, familial status, or national origin." 42
16 U.S.C. § 3604(b).  Section 3617 of the Act also makes it "unlawful to coerce,
17 intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or
18 on account of his having exercised or enjoyed" any right protected by the Act. 42
19 U.S.C. § 3617.
20    As alleged in the Amended Complaint, 24 CFR 100.7 (a), a regulation
21 promulgated by the Department of Housing and Urban Development, sets a standard
22 all landlords must heed: "A person is directly liable for ... (iii) Failing to take prompt
23 action to correct and end a discriminatory housing practice by a third party, where
24 the person knew or should have known of the discriminatory conduct and had the
25 power to correct it." What is described in 24 CFR 100.7(a) is nothing less than a
26 mandatory duty that SDHC must provide fair housing, free of racial discrimination
27 and harassment. *Guzman v County of Monterey* 178 Cal.App.4th (2009) review
28 denied (2010).  In its failure to adhere to the HUD standards, SDHC failed the

Plaintiffs and is liable for the emotional distress and physical injuries that were caused by the upstairs neighbor's racial harassment, hostility, and threatening behavior. Doc. 1-3, page 5 of 21, ¶ 10.

And what of the City's liability? As is shown hereafter, there is a virtual identity of interests regarding public housing between the City and SDHC, including oversight and ultimate control of SDHC by the City, and the City having policy direction over SDHC. For its failure of oversight and completely inadequate supervision of its agent, the City is vicariously liable to Plaintiffs for the third-party racial discrimination and hostility of the Plaintiffs' neighbor. As specified in 24 CFR 100.7(b): "Vicarious liability. A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law." This provision explicitly ties the City as principal to the failings of its agent, SDHC, in the failure to protect the Plaintiffs from racial discrimination and harassment perpetrated by their neighbor.

## III.

## SDHC IS AN AGENT OF THE CITY

As noted above, the City of San Diego seeks dismissal of this action against it on the argument that it and the San Diego Housing Commission (SDHC) are independent and the actions of the SDHC are not attributable to the City. The independence is non-existent in fact and the City's motion should be dismissed.

Today, one can go to the City's website and, at the link identified in Plaintiffs' request for judicial notice [City of San Diego>City Boards and Commissions>All Boards and Commissions>Housing Commission>Duties and Functions], read a description of the relationship between the City and the SDHC. There the City identifies the SDHC as one of its agencies and advertises that the housing needs of low-income persons in San Diego are handled by the SDHC. Among its duties: "Investigate and improve dwelling conditions in the City of San Diego. Review and

recommend revisions, actions, including recommendations on all matters before the Housing Authority."  Never has the importance of the job of the SDHC been as important as today with the high cost of housing in San Diego.

The **impression** created by the link, as part of the City's website, is that the City monitors and manages the housing issues in San Diego, an important function its citizens expect the City to conduct.  In the promise that the SDHC will investigate and improve dwelling conditions in the City, there is the expectation that fair housing will mean exactly that, not that the complaints of African-American tenants about racial discrimination will be ignored for years.  Whether the SDHC is truly an independent agency or not, clearly it is presented by the City as one of the City of San Diego agencies which answers to the City and is responsible for doing the business of the City as far as public housing and low income persons are concerned.

The provenance of the SDHC, as provided in the City's motion, illustrates that, even if SDHC is separate from the City, there are strings attached which render the separation illusory.

a. The SDHC was created by the City (Doc.6-4, page 7 of 15, ¶ III.D. and Doc. 6-5, page 2 of 8, San Diego Municipal Code, § 98.0301 (a));

b. Annually the SDHC must submit a budget to the City (Doc. 6-4, page 8 of 15, ¶ VIII.);

c. Among the SDHC's assignments is to "Investigate living, dwelling and housing conditions in the City of San Diego, and the means and methods of improving such conditions", and to "Determine where there is a shortage of decent, safe, and sanitary dwelling accommodations for persons of low income." (Doc 6-5, page 3 of 8, ¶¶ (c)(1) and (c)(2));

d. The City Council approves SDHC policy, budgets, and other actions governing housing programs (Doc 6-4, page 13 of 15);

e. The President of the City Council is the Chairman of the SDHC. Doc 6-5, page 5 of 8, ¶ (3);

1    f. The City's Mayor appoints the SDHC commission members subject to approval by the City Council. *Id*. page 6 of 8, ¶ (f).

From this, it may be reasonably inferred that the City controls the SDHC through budgetary control, the appointment of its members, and the direction and approval of the SDHC's plans for conducting operations.

  Significantly, members of the SDHC Commission may be removed by majority vote of the City Council for "inefficiency, neglect of duty, or misconduct in office". Id. ¶ (f)(5). From this single rule it may be inferred that the City oversees the SDHC to ensure efficiency and performance of duty and to prevent misconduct in office. Where, for example, it appears that SDHC members are not enforcing HUD rules, and are allowing racial discrimination by one tenant against other tenants, the City is permitted to remove those members by majority vote of the City Council. And the SDHC's conduct is measured against its performance of City-directed goals and the dictates of HUD. Since 1979, SDHC has been in contract with HUD "relative to the operation of Housing Programs". Doc. 6-4, page 7 of 15, ¶ I.A. SDHC's duty to approve "occupancy policies" consistent with HUD's requirements is specified in San Diego Municipal Code § 98.0301(d)(6). Doc. 6-5, page 4 of 8.

  The City further argues that the motion to dismiss is proper because the Health & Safety Code has authorized housing authorities to "sue and be sued". Doc. No. 6-1, page 8. This is evidence of SDHC's powers, not evidence of independence from the City. The evidence shows the City has ultimate power and control over the SDHC, the SDHC performs a governmental function on behalf of the City, and the City has the ability to change the course of the SDHC: on its face, the City is like the alter ego of SDHC.

  And what will discovery produce? How does the City stay informed about the business of the SDHC and whether it is conducting itself properly? Are there regular meetings between the SDHC and the City? Does SDHC inform the City, or does the City inquire about, problem tenants? Perhaps the City told the SDHC to ignore Ms.

Chambers' complaints. Maybe the two entities met regularly and nobody asked and nobody said anything about problem tenants. These are facts that will be revealed in discovery and may weigh both for and against the City's liability.

Thus it is clear the strings attached by the City to the SDHC make it appropriate that the City answer as a defendant in this action, vicariously liable at least for the damages caused by its agency, the SDHC, which permitted the racial discrimination and harassing behavior of the Plaintiffs' upstairs neighbor, and did not evict the racist neighbor sooner, and waited to evict until 753 days after Plaintiffs started complaining. Where the City has the power of the purse, the power of appointment, the power to direct the SDHC in its operations, the power to discipline SDHC Commission members, it cannot escape liability by saying, as it does here, "We set up a commission to do that – we're not responsible".

## IV.
## CONCLUSION

Based on the foregoing, it is appropriate to deny the City's motion to dismiss and to order the City to respond to the Amended Complaint.

Dated: May 15, 2020

LYNDE SELDEN II

*/s/ Lynde Selden II*
Lynde Selden II

Attorney for Plaintiffs
E-mail: lyndeselden@cox.net

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2020, I electronically transmitted the foregoing document using the CM/ECF system for filing, which will transmit the document electronically to all registered participants as identified on the Notice of Electronic Filing. Paper copies have been or promptly will be served on all parties not registered, and those indicated as non-registered participants.

*/s/ Lynde Selden II*
Lynde Selden II